UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Steven DRAGASITS,<br><br>                                Plaintiff,<br><br>v.<br><br>T. RUCKER, et al.,<br><br>                                Defendants. | Case No.: 3:18-cv-0512-WQH-AGS<br><br>**REPORT AND RECOMMENDATION ON DEFENDANTS' SUMMARY-JUDGMENT MOTION (ECF 88)** |

An inmate sued prison guards for civil-rights violations, including retaliation, denying access to courts, deliberate indifference to serious medical needs, and failing to summon medical care. The guards move for summary judgment.

## BACKGROUND

Plaintiff Stephen Dragasits is an inmate at R.J. Donovan Correctional Facility. (ECF 6, at 3.) This suit arises from two searches of his cell, exactly one year apart.

**A.    2015 Cell Search(es) by Defendants Rucker and Figueroa**

On February 9, 2015, prison officers conducted a facility-wide search. (*See* ECF 6, at 186; ECF 88-4, at 2; ECF 88-5, at 2; *see* ECF 88-1, at 8.) Two guards—defendants Rucker and Figueroa—searched Dragasits's cell. (ECF 88-4, at 2; ECF 88-5, at 2; *see* ECF 6, at 186.) They confiscated some items and offered Dragasits the receipt. (ECF 88-4, at 2; ECF 88-5, at 2; ECF 6, at 186.) Dragasits refused to sign it. (ECF 88-4, at 2; ECF 88-5, at 2; ECF 6, at 186; *see* ECF 88-1, at 3.)

Dragasits claims that, "because [he] refuse[d] to sign the receipt," Rucker and Figueroa searched Dragasits's cell a second time, taking other items "without providing a

receipt . . . ." (ECF 6, at 186.) Rucker and Figueroa attest they conducted only "one search."[1] (ECF 88-4, at 2; ECF 88-5, at 2.)

**B.     2016 Cell Search by Defendant Marshal**

On February 9, 2016—exactly one year after the 2015 cell search—defendant Marshal and another guard searched Dragasits's cell and seized his orthopedic shoes, among other items. (ECF 88-1, at 39; ECF 88-3, at 2–3; *see* ECF 6, at 4.) Before they left, Dragasits told Marshal that the "orthopedic shoes were approved by the clinic doctor" and that he "need[ed] them . . . ." (ECF 11, at 88.)

That same day, he formally asked that Marshal return his "doctor approved orthopedic shoes." (ECF 6, at 24.) In his written request, Dragasits recounted that he "offered twice to show you [Marshal] medical history paperwork" and complained that Marshal was "responsible for pain I am suffering each day I am without my orth[oped]ic shoes." (*Id.*) Marshal maintains that she refused to return the prescribed shoes because Dragasits "was unable to produce any . . . [medical] documentation" and "the prison's computer data base" did not show any medical footwear issued to him. (ECF 88-3, at 3; *see also* ECF 88-1, at 39; ECF 88-1, at 15, 18.)

Three days later, the database was updated with a notation for his "orthotic shoes." (ECF 88-1, at 16.) Dragasits in fact had a prescription for orthopedic footwear. (ECF 104,

---

[1] Defendants contend that Dragasits admitted at deposition that there was only *one* 2015 search. (ECF 88, at 13-14 (quoting ECF 88-1, at 9).) And "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991). But Dragasits's affidavit does not conflict with his testimony. In his affidavit, Dragasits maintained that his cell was searched twice on February 9, 2015. (ECF 6, at 186.) Similarly, in his deposition, Dragasits affirmed that February 9 was "the only day in 2015 that Figueroa and Rucker searched [his] cell" and that "they [n]ever search[ed] [his] cell at any other time[.]" (ECF 88-1, at 9.) In the light most favorable to Dragasits, when he testified that officers never searched his cell at any other "time," he meant that they never searched at any time other than February 9.

at 49.) Indeed, he suffered from years of foot pain and was still recovering from a recent foot fracture. (ECF 6, at 228; ECF 104, at 45–54.)

Although the medical staff later approved Dragasits's request for new orthopedic shoes (ECF 88-1, at 21), he waited nearly five months—until July 5, 2016—for them to be issued. (*Id*. at 30; ECF 104, at 57.) That same summer Dragasits sought medical attention for ankle "tendon/muscle tightness and pain." (ECF 104, at 83.) He was eventually diagnosed with an Achilles tendon injury and underwent a surgical repair. (ECF 6, at 298.)

## DISCUSSION

As a result of these searches, Dragasits alleges several civil-rights violations, which are each discussed below. Defendants move for summary judgment on all claims.

**A.    Governing Law**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must view the facts and draw all reasonable inferences "in the light most favorable to the party opposing the [summary judgment] motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted and alteration in original). In fact, the nonmoving party's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

When inmates represent themselves, the Court is obliged "particularly in civil rights cases, to construe the pleadings liberally and to afford the [prisoner] the benefit of the doubt." *Bretz v. Kelman*, 773 F.2d 1026, 1027 n.1 (9th Cir. 1985) (en banc). The Court must consider all of a pro se plaintiff's "contentions offered in motions and pleadings," when "such contentions are based on personal knowledge and set forth facts that would be admissible in evidence," so long as plaintiff "attested under penalty of perjury that the contents of the motions or pleadings are true and correct." *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004). In this case, Dragasits did not attest to the truth of his operative

complaint (ECF 42) or summary-judgment opposition (ECF 104). Thus, the Court will not consider factual statements made in those filings as opposing evidence. *See also Willis v. Ritter*, Civil No. 04-2303 WQH (JMA), 2008 WL 821828, at *1 n.2 (S.D. Cal. Mar. 26, 2008) ("[Plaintiff's] pleading does not conform with 28 U.S.C. § 1746; therefore, the allegations contained therein cannot be considered as a sworn affidavit in opposition to summary judgment under Fed. R. Civ. P. 56."), *aff'd*, 372 F. App'x 780 (9th Cir. 2010). The accompanying sworn affidavits and documents, however, are proper evidence. Also, the Court will consider various affidavits and documents that Dragasits incorporated by reference in his opposition. *See* Fed. R. Civ. P. 56(c)(1)(A) (allowing summary-judgment opposition to be supported by "citing to particular parts of materials in the record"); (ECF 104, at 43 (incorporating by reference exhibits at ECF 6)).

**B.    Retaliation**

Defendants Rucker and Figueroa move for summary judgment on Dragasits's First Amendment retaliation claim regarding the 2015 cell search. To prevail on a retaliation claim, the prisoner must prove that (1) "a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005) (footnote omitted). For summary judgment, Rucker and Figueroa need only negate one element. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[C]omplete failure of proof concerning an essential element of [plaintiffs'] case necessarily renders all other facts immaterial."). They negate at least two: protected conduct and lack of a legitimate correctional goal.

   **1.  *Protected Conduct***

Rucker and Figueroa argue that the 2015 search was motivated by a recent inmate-guard altercation and not by Dragasits's speech or other protected activities. (ECF 88-4, at 2; ECF 88-5, at 2.) They claim that, because of "an attempted murder of a correctional officer on Facility D [Dragasits's facility] the previous day," the warden instructed them

to conduct a search for weapons and contraband of "all cells and housing units" in that facility. (ECF 88-4, at 2; ECF 88-5, at 2.) And they contend the purpose was "to ensure the security of the prison and the safety of the inmates and staff" and "not in retaliation" for Dragasits's conduct. (ECF 88-4, at 2; ECF 88-5, at 2.)

Dragasits, on the other hand, offers varying theories for what prompted the search: (1) an inmate-guard altercation the day before, (2) the inmates' protest of the officers' conduct, (3) Dragasits's threats to file a grievance, and (4) Dragasits's refusal to sign a search receipt. Each of these rationales comes up short.

First, in his verified account, Dragasits states Rucker and Figueroa searched his cell "because the prior day there was an isolated incident between . . . officers and one prisoner attack [sic]." (ECF 6, at 186.) According to Dragasits's cellmate, "Officer Rucker said: 'I'll teach you guys to mess with green.'" (ECF 104, at 31.) The cellmate interpreted that statement as "referring to the [prior day's] incident in the building . . . that a prisoner assaulted a guard and the officers beat up the prisoner in front of everyone in the dayroom." (*Id.*) But this theory doesn't help Dragasits, as ordinary fistfights and brawls aren't a form of protected expression. The First Amendment only safeguards conduct with "sufficient communicative elements" that it presents an "intent to convey a particularized message" with a "great" likelihood that "the message would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (quotations omitted); *cf. Chaplinsky v. New Hampshire*, 315 U.S. 568, 573–74 (1942) (holding that "the constitutional right of free expression" does not protect "fighting words").

Dragasits's second rationale—that the protected conduct was the inmates' protest—is on stronger legal footing but lacks evidentiary support. In Dragasits's unverified operative complaint, he claims that he or other inmates "protest[ed]" during the prior day's altercation and that the protest provoked the search. (ECF 42, at 18.) Such an outcry may be protected speech. *See Williams v. Bahadur*, No. 2:13-CV-2052-TLN-EFB, 2015 WL 2174459, at *10 (E.D. Cal. May 8, 2015) (collecting cases holding that inmate protests could be protected speech), *adopted,* No. 2:13-CV-2052-TLN-EFB, 2015 WL 4744002

5

(E.D. Cal. Aug. 10, 2015); *but see Garrido v. Coughlin*, 716 F. Supp. 98, 99–101 (S.D.N.Y. 1989) (concluding that a "verbal confrontation" with a guard regarding the guard's "abusive treatment of another inmate" is not protected conduct). But Dragasits offers no admissible evidence that this protest even happened. In their sworn declarations, neither Dragasits nor his cellmate mention a protest the day before. (*See* ECF 6, at 186; ECF 104, at 31.) Both men instead understood the officers' motivation to be retribution for the inmate-guard fight itself. (ECF 6, at 186; ECF 104, at 31.) Without any admissible evidence to support it, the Court cannot find that there even was an inmate protest.

In his third formulation of the protected conduct, Dragasits charges—in his unverified complaint—that his threats to "use the 'inmate grievance process' and later 'sue'" provoked a second search of his cell. (ECF 42, at 20–21.) Threats to sue or "file a prison grievance" are generally protected speech. *See Arrant v. Velasquez*, No. CV 18-06871-SB (AGR), 2022 WL 980650, at *4 (C.D. Cal. Mar. 1, 2022), *adopted*, No. CV 18-06871-SB (AGR), 2022 WL 971956 (C.D. Cal. Mar. 31, 2022). But Dragasits never supports this theory with evidence, so it too fails.

Dragasits's fourth and final take on the protected conduct is that the officers reentered his cell "because [he] refuse[d] to sign the receipt." (ECF 6, at 186.) This version at least has the benefit of evidentiary support, as it comes from a sworn declaration. (*Id.*) But refusing to sign a search receipt is not protected speech. *See McDaniels v. Preito*, No. 3:17-cv-05801-RBL-DWC, 2019 WL 1510913, at *12 (W.D. Wash. Mar. 11, 2019) (noting a complete lack of authority to suggest "a prisoner's refusal to sign an observation report is protected speech under the First Amendment"), *adopted*, No. 3:17-cv-05801-RBL-DWC, 2019 WL 1505884 (W.D. Wash. Apr. 5, 2019), *aff'd*, 812 F. App'x 697 (9th Cir. 2020).

Thus, there is no genuine dispute about whether Dragasits engaged in protected conduct. He presented no such evidence, which is fatal to his retaliation claim.

### 2. *Legitimate Correctional Goal*

Even if Dragasits could prove that his protected speech led officers to search his cell, he still must show that defendants' actions were unrelated to a legitimate correctional goal. Specifically, he must demonstrate that their actions were "arbitrary and capricious" or "unnecessary to the maintenance of order in the institution." *Watison v. Carter*, 668 F.3d 1108, 1115 (9th Cir. 2012) (citations and quotations omitted).

The "preservation of internal order and discipline [and the] maintenance of institutional security" are "legitimate policies and goals" that, if they provide the motivation for an official act, will defeat a claim of retaliation. *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir. 1985). For instance, a search of "*all* the prisoners'[] cells following an attack on a guard" advances a legitimate correctional goal. *Swan v. Smith*, 50 F. App'x 362, 363 (9th Cir. 2002). So the officers' position that the search was to "discover inmate manufactured weapons" and "ensure the security of the prison and safety of the inmates and staff" following the "attempted murder" of an officer would be related to a legitimate correctional goal.[2] (ECF 88-4, at 2; ECF 88-5, at 2.)

Dragasits agrees that on February 8, 2015, there was an "attack" involving guards and "one prisoner." (ECF 6, at 186.) He described it as a "fight" that "95 percent of the inmates were not involved in." (ECF 88-1, at 6.) In the wake of such a guard-inmate fight—regardless of who started it—prison officials had a justifiable concern about further violence and a breakdown of discipline. One reasonable method for ensuring safety and order in a penitentiary is to remove any contraband and weapons from the inmates' cells. Indeed, "routine shakedowns of prison cells are essential to the effective administration of prisons." *Hudson v. Palmer*, 468 U.S. 517, 529 (1984). Thus, even viewing the altercation

---

[2] Dragasits speculates that, had there been an attempted murder, there would have been a prison-wide alert. (ECF 104, at 2.) But he doesn't show that such an announcement is automatic. Indeed, he never even contends that there wasn't such an alert. (*Id.*) Regardless, the Court need not consider his unverified statements. *See Willis*, 2008 WL 821828, at *1 n.2.

in the light most favorable to Dragasits, the prison's response was reasonably "[]necessary to the maintenance of order." *See Watison*, 668 F.3d at 1115. That is, the day after the altercation, guards searched every cell in the unit—a fact Dragasits acknowledges—meaning their search did not arbitrarily or capriciously target him. (*See* ECF 88-4, at 2; ECF 88-5, at 2; *see also* ECF 6, at 186 (Dragasits admitting that the search was "of Facility D building 17 each cell").)

In short, there is no genuine dispute about whether Dragasits can prove his retaliation claim. He cannot. He did not engage in any protected conduct for the guards to retaliate against. And the 2015 search "reasonably advance[d]" the "legitimate correctional goal" of maintaining order the day after an inmate-guard altercation. *See Rhodes*, 408 F.3d at 569. Thus, summary judgment should be granted for defendants on the retaliation claim.

**C.     Access to Courts**

Dragasits also alleges that Rucker and Figueroa interfered with his access to the courts by not issuing a receipt for the 2015 search. (ECF 42, at 21–22.) He insists that he "needed the search slip in order to further his grievance and ultimately access [] the courts by way of lawsuit." (*Id.* at 22.)

For an access-to-courts claim, an inmate must prove an "actual injury." *Lewis v. Casey*, 518 U.S. 343, 349 (1996). An "actual injury" is "actual prejudice with respect to contemplated or existing litigation, such as the inability to meet a filing deadline or to present a claim." *Id*. at 348 (citation and quotations omitted). The inmate must show that "the alleged shortcomings" on the prison's part "hindered his efforts to pursue a legal claim." *Id.* at 351.

Dragasits's challenge in proving such actual injury is that his requested receipt was not withheld for long. In fact, Dragasits concedes that another guard, Officer Corona, gave him the vital "cell search slip" on the same day as the 2015 search. (ECF 11, at 273.) Corona agrees that he issued Dragasits a receipt, albeit the next month. (ECF 6, at 208.) At worst, then, Dragasits was without a receipt for a month.

Regardless of how long he waited for the receipt, Dragasits managed to litigate his missing-receipt claim on many fronts. In March 2015, he sought relief through the prison grievance system, filing two requests for the return of his property.[3] (*See* ECF 6, at 16–17, 187). In August 2015, he went on to petition the California Victim Compensation and Government Claims Board (ECF 6, at 94–95)—a prerequisite to suing a public employee for tort damages. *See Lewis v. Deems*, No. 14-CV-03324-HSG (PR), 2015 WL 5738985, at *2 (N.D. Cal. Oct. 1, 2015) (citations omitted). In his Government Claim Form, he took exception to Officer Rucker "confiscat[ing] claimant's personal property without providing a receipt" in violation of California law. (ECF 6, at 95.) Ironically, the missing receipt was thus the *impetus* for Dragasits to access the courts, not an impediment to access. The Claims Board ultimately rejected his claim for two reasons. First, the Board ruled it untimely, as it was not "presented within six months after the event or occurrence as required by law." (ECF 6, at 164; *see also id.* at 165–70.) Second, the Board found the application "incomplete" and requested further "substantiating documentation" and an explanation of "how you determined the amount" of the claim. (*Id.* at 164.) Neither of these deficiencies were caused by the delay in delivering the cell-search receipt—whether Dragasits waited for it for hours or even a month.

Finally, Dragasits sued Rucker, Figueroa, and the prison in small-claims court regarding his confiscated property. (*See* ECF 88-1, at 10–11; *see also* ECF 6, at 389–91.) In fact, Dragasits initially prevailed, securing a $200 judgment against the prison. *See Dragasits v. Rucker*, ROA 43, No. 37-2015-00324061-SC-SC-CTL (Cal. Super. Ct. filed

---

[3] According to Dragasits, these requests went unanswered, and the prison has no record of him filing them. (ECF 6, at 17; ECF 11, at 272.) Whatever made these appeals vanish, Dragasits has no evidence that their disappearance had anything to do with Rucker or Figueroa or their withholding of the search receipt.

Aug. 7, 2015).[4] Although he eventually lost that judgment after the prison's successful appeal, there is nothing to suggest that the late-arriving receipt inhibited Dragasits's pursuit of small-claims relief. *See id.* at ROA 64-65; (ECF 88-1, at 11). (Alas, the small-claims court did not preserve the briefing and ruling on the prison's appeal.)

Even in the light most favorable to Dragasits, defendants' alleged receipt-suppression did not "hinder[] his efforts to pursue a legal claim." *See Lewis*, 518 U.S. at 351. So summary judgment should be granted for defendants on the court-access claim.

**D.  Deliberate Indifference to a Serious Medical Need**

Next, the Court considers Dragasits's claim that defendant Marshal violated his Eighth Amendment rights by confiscating his orthopedic shoes in the 2016 search. (ECF 42, at 11–12.) An inmate establishes an Eighth Amendment violation by proving that prison officials were "deliberate[ly] indifferen[t] to serious medical needs," meaning that they "intentionally den[ied] or delay[ed] access to medical care or intentionally interfer[ed] with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A claim of deliberate indifference has two distinct elements: (1) a "serious medical need" and (2) the "deliberate indifference" of prison officials. *Id.* Marshal only contests the second requirement. (*See* ECF 88, at 17–18.) She argues that she was not deliberately indifferent and that Dragasits suffered no damages anyway. (ECF 88, at 17.)

**1.  *Deliberate Indifference***

To show deliberate indifference, an inmate must prove the prison official "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious

---

[4] This Court takes judicial notice of the docket and filings in the small-claims action. *See* Fed. R. Evid. 201(b)(2)&(c)(1); *see also U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) ("[Federal courts] may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." (citations omitted)).

harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). In other words, the official must have "subjective knowledge" of the medical risk. *Harrington v. Scribner*, 785 F.3d 1299, 1304 (9th Cir. 2015).

Dragasits asserts that he made Officer Marshal aware of the excessive medical risk of confiscating his shoes. During the search, he told Marshal that his "orthopedic shoes were approved by the clinic doctor" and that he "need[ed] them." (ECF 11, at 88.) Another inmate corroborates that Dragasits told Marshal, "[T]hose are orthopedic shoes!" (ECF 104, at 28.) That same day, Dragasits filled out a written request to Marshal, seeking the return of his "doctor approved orthopedic shoes." (ECF 6, at 24.) And that evening, according to Dragasits, he went by her office twice, waved the receipts through the glass at her, and she twice acknowledged his receipts, saying that "she would be by [later] to pick them up," but never did. (ECF 11, at 88.)

Marshal does not dispute these assertions. She maintains instead that there was no independent "verifiable information" of a prescription, so she concluded that the orthopedic shoes were contraband. (ECF 88-3, at 3.) In particular, she contends, "Dragasits could not produce any doctor's order prescribing those shoes to him," nor "any other receipts of ownership, and there was no information in [the prison's computer database] showing that he was prescribed orthopedic shoes." (*Id.*; *compare* ECF 88-1, at 15, 18 (database pre-confiscation: no mention of orthotics) *with* ECF 88-1, at 16–17 (database post-confiscation: notations of "orthotic shoes" and "Ankle Foot Orthoses")). In her experience, inmates with valid medical prescriptions "can produce [medical] orders upon request" or the prescription will be noted in the prison database. (ECF 88-3, at 3.)

Yet Marshal does not address Dragasits's efforts immediately after the search to retrieve his shoes: his written request to Marshal that received "no response" (ECF 6, at 24) and his two attempts that evening to present his medical paperwork to her (ECF 11, at 88). In addition, according to the defense's own evidence, within three days of the search the prison database had a notation reflecting Dragasits's medical need for "orthotic shoes." (ECF 88-1, at 16–17.) Marshal offers no reason why the shoes weren't returned to

11

Dragasits when he tried to present the receipts on the evening of the search or at least when the prison database was updated with his prescription information.

In the light most favorable to Dragasits, a reasonable jury could find that Marshal was subjectively aware of Dragasits's serious medical risk based on his oral and written statements to her, another inmate's corroborating statement, Dragasits's two attempts that night to provide her with medical proof, and the database update in the subsequent days. That jury could also conclude that Marshal ignored the risk and refused to return those medically necessary shoes. *See Farmer*, 511 U.S. at 843 n.8 ("[A] prison official . . . would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist. . . .").

### 2. *Damages Causation*

Dragasits must also prove that Marshal's deliberate "indifference was the actual and proximate cause" of his damages. *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988). "[G]enerally[,] plaintiff must prove causation by expert medical testimony except where there is an obvious causal relationship—one where injuries are immediate and direct." *Ayobi v. Romero*, No. 1:19-cv-00964-SAB (PC), 2021 WL 63275, at *5 (E.D. Cal. Jan. 7, 2021).

Dragasits alleges that the confiscation of his orthopedic shoes led to two types of damages: (1) Dragasits's "deformed toes and bony protrusions caused 'extreme pain'" without his prescribed shoes, and "his condition became progressively worse" (ECF 42, at 16); and (2) "[m]onths later" he incurred "serious damage to his Achilles tendon," which ultimately required surgery. (*Id.* at 10, 12.) He offers no expert medical testimony on damages causation.

At least for Dragasits's first species of claimed damages—his daily pain without his prescribed shoes—a reasonable juror could conclude that his injuries were sufficiently "immediate and direct" to establish causation. *See Ayobi*, 2021 WL 63275, at *5. Dragasits attests that "without the orthopedic shoes [his] feet hurt badly when [he] walk[ed]."

(ECF 6, at 6.) He repeatedly informed prison personnel that he would remain "in pain until[] they [the shoes] are replaced." (*See id*.; *see also id.* at 24 (claiming the shoe confiscation led to the "pain [he is] suffering each day" that he is "without [his] orth[oped]ic shoes"); *id.* at 117 (complaining that "not having these shoes to wear [is] causing [his] feet an enormous amount of pain each and every day").) And even in the medical records Marshal relies on, Dragasits reported he could only jog "once in a while without any problem" and "would experience some dull to sharp pain afterwards." (ECF 88-1, at 21.) Thus, in the light most favorable to Dragasits, a jury could reasonably find that depriving him of his medical shoes caused the "'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *See Estelle*, 429 U.S. at 104 (citation omitted).

The lack of expert causation evidence is harder to overcome in establishing Dragasits's other shoe-related damages—the rupture of his Achilles tendon months after the shoe confiscation. When injuries "are of such a character as to require skilled and professional persons to determine the cause and extent thereof, they must be proved by the testimony of medical experts." *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 997 (10th Cir. 2019). Dragasits has no such expert evidence.

Even if the Court overlooks the lack of expert testimony, it is unclear how Dragasits proves causation for his Achilles tear. His shoes were confiscated in February 2016 (*see, e.g.*, ECF 88, at 60), and he was issued new orthopedic inserts and new orthopedic shoes on July 1 and July 5, 2016, respectively. (ECF 88-1, at 27, 30.) The record is conflicting as to whether the injury occurred before or after he received this new medical footwear. (*Compare* ECF 88-1, at 33, 36 (tendon injury on "7/15/16") *with* ECF 6, at 333 ("February 2016"); ECF 104, at 103 ("March 2016"); *id*. at 94 (around June 2016).) More importantly, it is unclear *how* this injury occurred. Although Dragasits alleges that the standard-issue shoes he was forced to wear "agitated the back of my ankle" leading to "an eventual rupture (left foot)" (ECF 6, at 104), he also reported to doctors that the Achilles tear happened after "someone kick[ed] me on [the] back of my heel." (ECF 88-1, at 33, 36;

*cf.* ECF 104, at 94 (Dragasits "felt like when he was walking . . . somebody hit him in the back of his ankle").)

Setting aside the uncertain method and timing of the injury, Dragasits simply offers no evidence—other than his own lay opinion (*see* ECF 6, at 104)—linking his medical-shoe deprivation to his tendon rupture. That thin evidentiary reed will not support a causation finding for a complex injury such as this, which ultimately required surgery. *See, e.g.*, *Manriquez v. Town of Superior*, No. CV-18-02026-PHX-DWL, 2020 WL 5544407, at *16 (D. Ariz. Sept. 16, 2020) (precluding damages for a "torn labrum or other long-term shoulder damage" when there were no "medical witnesses who might tie the shoulder damage reflected in the MRI to [plaintiff's] encounter with Defendants," as it "would be 'mere speculation' for a juror to conclude this damage was caused by the encounter"); *Paramo v. City of Morgan Hill*, No. C01-0825MMC(PR), 2002 WL 1497521, at *4 (N.D. Cal. July 9, 2002) (granting summary judgment against plaintiff because, among other things, "plaintiff presents no medical evidence" that his "torn ligaments" and other injuries were "the result of defendants' actions").

Although Dragasits has not shown that Marshal's actions caused his Achilles rupture or any long-term tendon damage, he should remain "free to argue that he experienced pain and suffering" because he was deprived of his orthopedic shoes. *See Manriquez*, 2020 WL 5544407, at *16. Thus, summary judgment should be granted for defendant Marshal only to the limited extent that Dragasits cannot recover damages for his torn Achilles tendon.

### E. Failure to Summon Medical Care

Finally, we turn to Dragasits's claim against Marshal for failing to summon medical care during the 2016 cell search. Under California law, a prison official is liable if the official "knows or has reason to know that the prisoner is in need of immediate medical care and . . . fails to take reasonable action to summon such medical care." Cal. Gov't Code § 845.6. Liability under this statute is limited to "serious and obvious medical conditions requiring immediate care." *Castaneda v. Dep't of Corr. & Rehab.*, 212 Cal. App. 4th 1051,

1074 (2013). Marshal argues that Dragasits's "condition did not rise to the level which required Marshal to summon medical assistance."[5] (ECF 88, at 19.)

In the light most favorable to this pro se civil-rights plaintiff, during the 2016 search Dragasits told the guards in a hoarse voice, "I am sick." (ECF 88-1, at 12.) One of the guards responded, "Well, you could be faking that." (*Id.*) Yet Dragasits was "incapable of getting up," and "it was only because the [officers] helped [him] out into the dayroom" that he managed to leave his cell. (*Id.*) Even so, he was "not able to stand for long," and he "had to go back down . . . to [his] bed." (*Id.*)

The above recitation—which Marshal largely disputes (*see* ECF 88-3, at 4)—is sufficient to survive summary judgment. Courts have found failure-to-summon claims to be triable when plaintiffs needed assistance walking and their ailing state was announced or otherwise obvious. *See Zeilman v. Cnty. of Kern*, 168 Cal. App. 3d 1174, 1187 (1985) (finding a triable question of fact on "whether plaintiff's use of crutches and her apparently agitated, emotional, and weakened condition should have given rise to knowledge of her need for immediate medical care"); *Hart v. Orange Cnty.*, 254 Cal. App. 2d 302, 308 (1967) (affirming plaintiff's judgment in a failure-to-summon case in which jail "custodians were helping [the arrestee/decedent] to walk" when he arrived at the jail, an officer was specifically told the arrestee "was sick," and the arrestee later lost consciousness).

---

[5] In their brief, defendants also mention that "there is no evidence that Plaintiff was harmed by the alleged failure to summon medical care." (ECF 88, at 19.) If this conclusory statement were intended as a stand-alone argument about the lack of damages, the Court would not consider it. This passing reference—without analysis or citation to the record—is too undeveloped to meet defendants' burden on summary judgment. *See Wells Fargo Bank, N.A. v. Renz*, 795 F. Supp. 2d 898, 911 (N.D. Cal. 2011) (noting that, despite "a string citation to various cases and California civil jury instructions," defendants' failure to provide "any explanation or analysis of how these authorities support their position" or "citations to the record to support their factual assertions" is "improper" and fails "to carry [defendants'] initial burden on summary judgment").

The defense points to several precedents involving deficient failure-to-summon claims, but each of those cases involved plaintiffs who walked without assistance and had only minor (or nonobvious) medical complaints. *See Anaya v. Marin Cnty. Sheriff*, No. 13-CV-04090-WHO, 2015 WL 1407362, at *6 (N.D. Cal. Mar. 27, 2015) (dismissing plaintiff's failure-to-summon claim because she failed to allege that her medical needs were "obvious to the deputies"); *Lawson v. Super. Ct.*, 180 Cal. App. 4th 1372, 1385 (2010) (holding that "the denial of [personal] medications and a breast pump . . . does not amount to neglect of a serious and obvious medical condition"); *Watson v. California*, 21 Cal. App. 4th 836, 842–43 (1993) (affirming dismissal of inmate's failure-to-summon claim because he "was able to walk," merely "complained that his ankle was tender," "[n]one of the doctors who examined [him] recognized the extent of the injury," and prison officials in fact "provided prompt medical care"); *Lucas v. City of Long Beach*, 60 Cal. App. 3d 341, 350 (1976) (inmate "manifested only the symptoms of intoxication"); *Kinney v. Cnty. of Contra Costa*, 8 Cal. App. 3d 761, 770 (1970) ("A jail prisoner's request . . . for something for a headache cannot reasonably be deemed notice 'that the prisoner is in need of immediate medical care.'").

Thus, Marshal has failed to establish that there is no genuine dispute as to the material facts, and summary judgment should be denied on the failure-to-summon claim.

## CONCLUSION

Accordingly, the Court recommends entering the following orders:

1. Summary judgment is **GRANTED** for defendants Rucker and Figueroa on all claims against them, including the:
    a. First Amendment retaliation claim; and
    b. First Amendment access-to-courts claim.
2. Summary judgment is **GRANTED IN PART** and **DENIED IN PART** for defendant Marshal as to the Eighth Amendment deliberate-indifference claim. Specifically, Dragasits is foreclosed from recovering damages for his torn

1        Achilles tendon. Marshal's summary-judgment motion on this claim is otherwise
2        denied.
3    3. Summary judgment is **DENIED** as to the California state-law claim against
4        Marshal for failing to summon medical care.

The parties have 14 days from service of this report to file any objections to it. *See* 28 U.S.C. § 636(b)(1). The party receiving an objection has 14 days to file any response. *See* Fed. R. Civ. P. 72(b)(2).

Dated: August 19, 2022

                                              Hon. Andrew G. Schopler
                                              United States Magistrate Judge